# THE STATE v. JONES.

1. The 6th and 7th sections of the 3d chapter of the penal code, do not create an offence unknown to the common law, or increase the punishment of a common law offence; the offences therefore, described in those sections may be proceeded against, and punished upon an indictment for murder at common law.
2. When there is one good count in an indictment, the verdict and judgment will not be disturbed.
3. The court may refuse to quash a count in an indictment, and such refusal cannot be assigned as error.
4. The court may in its discretion permit the prosecutor to elect on which of the counts he will proceed.
5. When a bill of exceptions is allowed in a criminal case, the facts embodied in it become a part of the record; and if a writ of error is allowed, it brings up the entire record, and error may be assigned on any part of it.
6. As the jury may find a general verdict, they are judges both of law and fact, and may, if they think proper to do so, disregard the opinion of the court upon the law.
7. The proper form of the oath to be administered to the jury, in a criminal case, is, that they shall " render a true verdict according to the evidence."

Error to the Circuit Court of Perry county.

The defendant was indicted in the circuit court of Perry county, for the murder of his own slave. The first count of the indictment, is in the usual form of an indictment at common law, charging the slave to be his property, and the death to have been caused by beating with clubs, sticks and whips.

The second count is as follows : " and the jurors aforesaid, upon their oaths aforesaid, do further present, that the said William H. Jones, on the day and year last aforesaid, with force and arms in the county aforesaid, in and upon a slave named Isabel, then and there belonging to him the said William H. Jones, in the peace of God, and our said State, then and there being, feloniously, wilfully and of his malice aforethought, an assault did make, and her the said Isabel did then and there feloniously, wilfully, and of his malice aforethought, cruelly, barbarously and inhumanly beat and whip, of which said beating and whipping the said Isabel, on the day and year last aforesaid, died. And so the jurors afore-

said, upon their oaths aforesaid, do say that the said William H· Jones, the said slave Isabel in manner and form aforesaid, feloniously, wilfully and of his malice aforethought, did kill and murder, contrary to the statute, and against the peace and dignity of the State of Alabama.

The third count is for an assault and battery, and cruel punishment.

From a bill of exceptions sealed by the presiding judge, at the instance of the accused, it appears that before the cause was put to the *venire*, the prisoner, by his counsel, moved the court to quash the indictment, on the ground that it contained a misjoinder of offences; and the court was of opinion that the indictment did contain a misjoinder of offences, but refused to quash the same, allowing the solicitor to elect on which of the counts he would proceed, who thereupon elected to proceed on the first and second counts, disregarding the third. To which opinion of the court, refusing to quash, and permitting the solicitor to elect on which of the counts he would proceed, the prisoner by his counsel excepted.

The proceedings upon the trial are thus stated: "On this day, which was appointed for the trial of this cause, at a previous day by order of the court, and consent of parties, came William M. Brooks, solicitor, who prosecutes for the State, and the defendant in proper person, and by his counsel; and it was made to appear to the satisfaction of the court, that the prisoner had been served with a list of the jurors, and a copy of the indictment, ten entire days previous; and the bill of indictment being read, the defendant pleaded thereto, 'not guilty,' and thereupon came a jury, &c., who being elected, tried and sworn, well and truly to try, and a true deliverance to make between the State and the prisoner, and a true verdict to render according to the evidence, upon their oaths, do say, 'we, the jury find the prisoner guilty of murder in the second degree;' and thereupon the prisoner was remanded to jail to await the sentence of the court."

And at a subsequent day, the prisoner having answered that he had nothing to say why sentence should not be pronounced according to law, the court sentenced him to be confined in the penitentiary for ten years.

The assignments of error are,

1. The two counts of the indictment for murder are defective

in not conforming to the 7th section of the 3d chapter of the penal code.

2. There is a general verdict upon a misjoinder of offences.

3. There is a misjoinder of offences and a general verdict.

4. The court erred in permitting the solicitor to elect on two counts, charging different offences, punishable differently.

5. The prisoner was not arraigned before pleading to the indictment.

6. The record does not shew that the prisoner was present when the jury rendered their verdict.

7. The jury should have been sworn to render a true verdict according to law and the evidence.

8. The oath administered was not the one prescribed by the statute of 9th January, 1841.

BAGBY, GAYLE and DOWNMAN, for the prisoner, contended, that by the 7th section of the 3 chapter of the penal code, the legislature had created a new offence; that an indictment for that offence should set out the exceptions, as that in fact constituted the crime., That therefore, the first count and second count were both bad. That if the first count was good, the second was clearly bad. That if the counts were both good, the first being at common law, and the second under the statute, and the judgment and punishment being different, there was a misjoinder of offences, and the verdict being general, cannot be sustained. [1 Chitty's Crim. Law. 282; 2 Pick. 141; Nott & McCord, 365.]

That the bill of exceptions would not be looked to by the court, because it presents a point which cannot be raised here; but at all events will be disregarded as to the election permitted by the court; and there is then evidently a misjoinder of offences. [5 Porter, 32; 3 Greenleaf 219, 183; 4 Pick. 302; 15 Wend. 281; 8 Johns. 495; 5 ib. 467; 2 Caine's 169; 8 East, 280; 2 Dall. 422; 2 Binney, 168; 1 Bac. Ab. 529; 2 Brock. 75; 1 Wend. 418; 1 Pick. 37; 1 Leigh, 86.]

That the record should show that the indictment was read to the prisoner. [1 Ala. Rep. 655; 4 Black. Com. 323; 2 Hale 218.]

The record does not show that the prisoner was present when the verdict was rendered, except by argument or inference, and there can be no intendment against the prisoner.

That the jury are judges both of law and fact, in criminal ca-

ses, and were precluded from judging of the law by the form of the oath. That this right has never been questioned in England, except in trials for libel; and after a great struggle, the question was settled there in favor of the people, and has been expressly adopted into the constitution of most of the States of the Union; [3 Johns. Cases, 337; 10 Pick. 481; 18 Maine 346; 4 Black. 361.]

The ATTORNEY GENERAL, *contra.* The act of the last legislature authorising a bill of exceptions in criminal cases, did not authorise the prisoner to do any thing more than to take an exception to the opinion of the court, and spread the facts upon the record, that the judges of the Supreme Court might be able, if they thought proper, to award a writ of error; and no other error can be assigned than is brought up by the bill of exceptions. A motion to quash an indictment is addressed to the discretion of the court below, and cannot be revised in this court, [3 M. & S. 549; 3 D. & E. 106.]

Where there is one good count to which the finding may be referred, the indictment will be sustained, [5 Porter, 32.]

ORMOND, J.—The first question to be considered is, what points are presented for revision by the writ of error. The Legislature, at its last session, authorised bills of exceptions to be taken by defendants in certain criminal cases, in the same manner as in civil cases. The counsel for the prisoner, contends that the court may disregard the bill which has been taken in this case, upon the ground that this court, if the court below had refused to seal the bill, would not have awarded a mandamus; while on the other hand, the Attorney General insists that this court can look to no other error than that assigned on the bill.

Previous to the passage of this law, no question of fact could be presented on the record, in a criminal case, for the revision of this court; unless the court below thought proper to refer it as a question of novelty and difficulty. The plain design of the Leislature was to give to defendants, in those criminal cases embraced by the statute, the right to put any question of fact upon the record, to enable them to apply to this court for a writ of error. The writ of error, when granted, applies to, and brings up the entire record, and error may therefore be assigned upon any part of it. When a bill of exceptions is allowed, either in a civil or

criminal case, the facts there embodied become a part of the record, and cannot be waived by either party, or disregarded by this court.

The three first assignments of error suppose a misjoinder of offences in the two first counts of the indictment, and that, as the verdict was general, no judgment can be rendered upon it. The first count in the indictment is a count at common law, for the murder of the slave, to which no objection has been urged. The second appears to have been framed on the 7th section of the 3d chapter of the penal code, which declares that an owner of a slave, causing his death by whipping, &c., though without intention to kill, unless in self-defence, or in the use of so much force as is necessary to procure obedience from the slave, shall be deemed guilty of murder in the second degree.

There is no difference in principle between the 7th and the preceding section; the first embracing the case of an overseer, the latter that of an owner. These sections treat of the crime of murder committed on a slave; they do not create a mere offence, unknown to the common law; nor do they subject the offender to a greater punishment than was inflicted at common law; they are therefore not statute offences, and by necessary consequence, an indictment may be framed upon them at common law, as was held by this court at the present term, in the State v. Flanegin. Indeed the sections of the code we have been considering, merely promulgate rules of evidence, and are declaratory of the common law. It is therefore unnecessary to consider whether the second count be good or not, as the first count is unquestionably good, and that will sustain the judgment of the court, as was held by this court in the State v. Coleman, [5 Porter, 32,] and to the same effect might be cited numerous authorities in England and the United States.

The same case is also an authority to show that the court may refuse to quash an indictment, and put the party to his demurrer; and that a refusal to quash cannot be reviewed on error. It is equally as clear that the court may permit the solicitor to elect on which of the counts of the indictment he will proceed. Such election was made in this case, and the third count, which was for a misdemeanor, abandoned. This course, could not by possibility prejudice the prisoner, and is in accordance with the established practice at the present day. [Young v. The King,

3 D. & E. 106; Commonwealth v. Gillespie, 7 S. & R. 469; Burk v. The State, 2 H. & J. 426, Kane v. The People, 8 Wend. 211; 1 Chitty's Crim. Law, 249.]

The assignment that there was no arraignment of the prisoner is not sustained by the record. It there stated that " the bill of indictment being read the defendant pleaded thereto, not guilty, and thereupon came a jury, &c." It was supposed the indictment might have been read for the information of the bystanders or read to the jury, and that afterwards the defendant was called on to plead; but it appears that the jury were not empannelled when the indictment was read, and it would be absurd to suppose that the indictment was read to persons having no interest whatever in it. But there is here no room for conjecture. The indictment being read, the defendant pleaded thereto " not guilty," is the language of the record, which is a clear and perspicuous statement of the arraingment of the prisoner.

Nor is there any force in the objection that it does not appear that the prisoner was present when the jury rendered their verdict. In the State v. Hughes, [2 Ala. Rep. 102,] it appeared that the prisoner was not present when the verdict was rendered, and for that cause he moved in arrest of judgment; and this court held it error and reversed the judgment. In this case, we think it does sufficiently appear that the prisoner was present when the verdict was rendered. The record, after reciting the rendition of the verdict, proceeds to state " and thereupon the prisoner was remanded to jail to receive the sentence of the court." According-ing to all rules of fair interpretation and just criticism, we must understand from this, that the prisoner was in court when the ju-ry rendered their verdict. The words " and thereupon," connects the prisoner with the rendition of the verdict, and shows that he was present. We cannot presume, as we are asked to do, by the counsel, that the prisoner, having been bailed previous to his trial, was permitted by the court to leave the bar, while the jury were deliberating on their verdict, in a case involving a capital felony. He might, it is true, have been remanded to jail whilst the jury were considering of their verdict, but if that was done, it appears he was again remanded to jail, language which cannot be true, if he was not brought from the jail to hear the verdict pronounced. In addition, it may be added that when called on to say whether he had any thing to object to the sentence being pronounced, he

answered, "nothing." The record is a narative of what took place at the trial; in construing it we apply to it those rules of interpretation which govern all written instruments. It is to be construed according to its plain and obvious import, and not by those rules which would make it necessary that it should state those facts it purports to detail, with so much precision and certainty as to exclude every other conclusion.

It remains but to enquire whether the proper oath was administered to the jury. They were sworn " a true verdict to render according to the evidence;" and it is insisted they should have been sworn a true verdict to render according *to the law and evidence*. In the examination of this question, the counsel for the prisoner have gone into an able and elaborate argument to show, that in criminal cases, the jury are judges both of law and fact; but the true question appears to be whether by the form in which the oath was administered the jury were deprived of the power of determining the law.

The power of the jury to judge both of law and fact, results necessarily from the very constitution of that body, and from their right to find a general verdict for the prisoner, which the court cannot disturb. This right is explicitly admitted by Littleton & Coke, and other ancient writers upon the common law. [Coke Litt. 228, a.] So in 4 Black. Com. 361, it is laid down that if the jury doubt the matter of law, they may choose to find a special verdict; but have an unquestionable right to find a general verdict, and determine the law as well as the fact. At the same time it cannot be doubted that these sages of the law, considered it the duty of the jury, to receive the law from the court, and that it was at the " hazard of a breach of their oaths, when they undertook the decision of questions of law." [See also People v. Croswell, 3 Johns. Cases, 337.]

When the power of juries to find a general verdict, and consequently their right to determine, without appeal, both law and fact, is admitted, the abstract question whether it is, or is not their duty to receive the law from the court, becomes rather a question of casuistry or conscience, than one of law; nor can we think that any thing is gained in the administration of criminal justice, by urging the jury to disregard the opinion of the court upon the law of the case. It must, we think, be admitted, that the judge is better qualified to expound the law, from his previous

The State v. Jones.

training, than the jury; and in practice, unless he manifests a wanton disregard of the rights of the prisoner, a circumstance which rarely happens in this age of the world, and in this country, his opinion of the law will be received by the jury as an authoritative exposition from their conviction of his superior knowledge of the subject.

This right of the jury is doubtless one of inestimable value, especially in those cases where it may be supposed the government has an interest in the conviction of the criminal; but in this country, when the government in all its branches, executive, legislative and judicial, is created by the people, and is in fact their servant, we are unable to perceive why the jury should be invited or urged to exercise this right contrary to their own convictions of their capacity to do so, without danger of mistake. It appears to us that it is sufficient that it is admitted that it is their peculiar province to determine facts, intents, and purposes; that it is their right to find a general verdict, and consequently that they must determine the law; and whether in the exercise of this right they will distrust the court as expounders of the law, or whether they will receive the law from the court, must be left to their own discretion, under the sanction of the oath they have taken.

We do not doubt that the oath administered in this case was the proper one. It is the oath which has been administered to juries, in criminal cases, from the earliest records of criminal trials, to the present day, both in England and the United States; and sitting here as we do, to expound and not to make or alter the law, we must consider this unbroken chain as authoritative testimony of what the law is. We entertain as little doubt that this form of administering the oath does not preclude the jury from determining both law and fact. When a juror is sworn, he is invested with the office of judge, and authorised to pronounce the law in the particular case he has to try, and does so when he renders his verdict, whether he abides by or disregards the opinion of the court. But it is said in argument that if he be a judge, like all other judges, he should be sworn faithfully to administer the law. The juror is one of the prisoner's peers, authorised and required by his oath to make a true deliverance between him and the State, and cannot be supposed to have any desire to oppress the prisoner, or to find him guilty against law, and there is therefore no reason to apprehend that he will convict him against law.

85

It is, however, impossible to entertain a serious doubt that the very form of the juror's oath binds him to decide the law correctly, precisely as it is obligatory on him to determine the facts truly.

The charge preferred by the State, is, that the prisoner, by an act done, has offended one of its laws. The law which he is charged to have offended, is certain, and the juror as judge must be presumed to know it; the guilt or innocence of the prisoner depends on the ascertainment of the fact, and if in passing on the guilt or innocence of the prisoner, the juror should intentionally misapply the law to the fact, he is as guilty of a violation of his oath as if he should falsely find the fact either for or against the prisoner.

The earnestness with which this point was pressed on the court, must be its excuse for examining, at some length, a question about which it is difficult to suppose any serious doubt could be entertained.

It remains but to add, that no error is shown upon the record, and that the judgment of the court below is therefore affirmed.