# REPORTS

OF

# CASES ARGUED AND DETERMINED

## AT THE JANUARY TERM, 1872.

———•◆•———

## JOHNSON *vs.* THE STATE.

[INDICTMENT FOR MURDER.]

1. *Capital cases; what must affirmatively appear.*—In capital cases, and other felonies, there are some matters which must affirmatively appear in the record, otherwise the judgment will be reversed; among these is the oath administered to the jury.

2. *Oath of jury; what omission will invalidate verdict.*—If it appear from the record that an essential part of the oath, required by section 4092 of the Revised Code to be administered to the jury, was omitted, the judgment will be reversed.

3. *Dying declarations, when admissible; what evidence of, sufficient to authorize admission of.*—As a general rule, dying declarations are only admissible in evidence, where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the dying declarations. When this is the case, dying declarations are admissible if the deceased knows or thinks he is in a dying state. Positive evidence of this knowledge is not required, but it may be inferred from the conduct and condition of the deceased. The dying declarations admitted by the court, under the evidence in this case, were properly admitted.

4. *Motion to exclude evidence, refusal to decide at time when made; when will be cause for reversal of judgment.*—Where the State offers evidence of the dying declarations of the deceased, and the defendant objects to their admissibility and moves to exclude them, if the court refuses to decide on the motion until all the evidence in the case is closed, and compels the defendant to proceed with his defense, and then, after the evidence in the case is closed, decides the defendant's motion and excludes a part only of the dying declarations objected to and the defendant is convicted, the judgment will be reversed.

2

5. *Wife, not competent witness for husband in a criminal case.*—In a criminal case the wife is sometimes a competent witness against the husband, but never for him.

6. *Venire, motion to quash; what no ground for.* —A mistake in the christian name of one of the jurors on the list delivered to a defendant, in a capital case, is no cause to quash the venire. The remedy in such a case is provided in section 4175 of the Revised Code.

7. *Absent juror; when court not bound to send for.* —The court is not bound to send for a juror, summoned in a capital case, who fails to answer to his name when called, although it be shown that the juror resides in the city where the court is held, and was in the city at the time his name was drawn.

8. *Same; when court should send for.*—If, however, a juror, in such a ca e, is in jail under the order or sentence of the court, a refusal to send for him, on the request of the defendant, is a reversible error.

APPEAL from the City Court of Montgomery.
Tried before Hon. JOHN D. CUNNINGHAM.

Joe Johnson, the appellant, having been indicted for the murder of Henry Walton, was tried, found guilty of murder in the first degree, and sentenced to be hung. Having reserved exceptions to various rulings of the court below, he brings the case to this court by appeal.

On the trial, after several persons had been selected as jurors, and after both the State and the defendant had each exhausted several peremptory challenges, the sheriff drew from the hat the name of *R.* A. Brady, who was not on the list of jurors, summoned for the trial, which had been served upon defendant. "The defendant made this fact known to the court, and objected to going any further with the trial upon said list of jurors summoned for his trial, and moved the court to quash said list and also to order another summoning of persons as jurors for the trial of defendant. Thereupon the sheriff stated that he summoned *R.* A. Brady as a juror for this trial, and instead of putting his name on the list which had been served on defendant, he (the sheriff) by mistake put *I.* A. Brady on the list served on defendant. The court overruled defendant's objection and motions, and directed the sheriff forthwith to summon another person as a juror and to put his name in the hat in place of said Brady, and directed the drawing

to be suspended until this could be done; the court at the same time announcing to the defendant that he had the right to challenge peremptorily the juror thus summoned, in addition to the peremptory challenges allowed him by law. To each of these rulings and decisions defendant duly excepted."

After this, and before the jury was complete, the sheriff drew from the hat the name of Samuel Lacy, a well known resident citizen of Montgomery, and who was then known to be in the city of Montgomery, and whose name was on the list of jurors summoned for the trial of defendant and served upon him. Lacy being absent, the defendant insisted that the further drawing be suspended until Lacy was sent for, and moved the court to have said Lacy sent for and brought into court. The court thereupon ordered a fine assessed against Lacy, overruled defendant's motion, and ordered that the drawing of jurors from the hat continue until a jury was obtained. To each of the aforesaid rulings the defendant duly excepted."

The jury being complete, the defendant went to trial on plea of not guilty.

The evidence shows that Walton, who had the defendant employed on his plantation, received a message from defendant one Wednesday morning in the latter part of November, 1870, requesting him (Walton) "to come down here, [to Joe's cabin] and bring that stick he beat my wife with; I want to take it to town with me." On receiving this message Walton went into his house, and in a few minutes afterwards went down to Joe's cabin. Shortly after this a gun was heard to fire, and Walton was found some twenty steps or more from the door of Joe's cabin, lying upon his back, his knees drawn up, holding in one hand a loaded "Derringer pistol." He had been "shot in the right arm and side, sort of to the rear," with a load of ordinary sized bird-shot. This occurred about an hour "after sun-up," and Walton died between ten and eleven o'clock the same morning. There was no eye-witness to the shooting.

Lum Judkins, a witness for the State, who heard the gun fire, ran immediately to Walton, who was lying on the

ground "hollering." Walton said to witness, "Joe has killed me. I was talking to him and he shot me, and he has killed me." To this witness replied, "I reckon not." Walton said, "Yes, I am bound to die." After this Walton was "toated" some distance to his house. He was shot about an "hour after sun-up," and died between ten and· eleven o'clock the same morning.

Dr. Hill, a witness for the State, testified that he was a practicing physician of many years' experience, and had been sent for to see Walton, reaching his house about eight o'clock in the morning. At that time Walton was suffering greatly and gradually sinking. "Deceased, when offered medicine, would shake his head and say it is no use to do any thing, but would take the medicines given him. Witness did not tell Walton what he thought of his condition. Walton was in a dying condition when witness first saw him—collapsed, and with very little or no pulse. Towards the last deceased's breathing was a little labored; he talked so he could be understood—showed a little effort. Ceasing to talk was the first symptom of immediate dissolution. All at once, two hours after witness saw him, Walton became speechless."

Thomas Merriwether, a witness for the State, testified that he lived about a mile from Walton's house, and reached there three quarters of an hour before Walton died. "Witness thought deceased in a dying condition as soon as he saw him. Deceased told witness, '*If they don't do something for me, I will die.*' Witness heard deceased say nothing else about dying. Dr. Hill told deceased that it was necessary to know something about the difficulty, and deceased replied, 'Joe sent for me and I went down; when I got close to him he told me not to come closer, if I did he would shoot me. I wheeled to walk off, and he shot me.' This declaration was made about fifteen minutes before Walton died."

Dr. Hill was then recalled, and testified as to the declaration made by deceased, his testimony being the same as that of witness Merriwether. This declaration was made not long before Walton's death; and at the time it was made

witness could perceive no pulse, and Walton's hands and feet were cold. Witness had given Walton opiates and whisky two or three times. In reply to a question by the prosecution, "if a man in Walton's condition was bound to know that he was bound to die," the witness was permitted, against defendant's objection, to answer, and stated that "he (witness) was satisfied in his own mind that deceased believed he would die."

All the foregoing testimony was given to the court as a basis for determining upon the admissibility of the dying declarations of deceased, but was delivered in the presence and hearing of the jury, who were cautioned by the court that none of the testimony relating to the declarations of deceased should be considered by the jury, except that which the court would thereafter expressly inform the jury should be considered by them.

The State introduced evidence tending to show, that a day or so before the killing, the defendant, who had been absent from the place for several days, and was then on his way to Walton's place, was seen to take a drink, and on being asked by a witness if he would not give some of it to one Jerry Lucas, remarked, "Uncle Jerry can not drink this liquor. I can. There is hell in me." There was some evidence tending to show that about this time defendant had some trouble with his bowels, and his physician, the witness Dr. Hill, had given him a prescription of some sort of bitters. There was evidence tending to show that on Sunday before the killing, which occurred on the next Wednesday, Walton was seen coming out of his house, shaking his stick, which was a good sized walking cane, at some one, and saying, "When Joe comes tell him I'll give him the same." The witness who testified to this did not know to whom Walton was talking, and had never informed Joe of it. The State also introduced the clothing worn by Walton at the time he was shot.

After this testimony was delivered to the jury the State announced that it had closed its evidence, except evidence in rebuttal; and "thereupon the defendant moved the court separately and successively to exclude each of the dying

declarations of deceased, as testified to by the foregoing witnesses. The counsel for the State asked the court not to exclude the evidence of the dying declarations until authorities could be submitted to the court, they believing that Alabama authorities could be found which would be decisive of the motions. Thereupon the court remarked, that after the defendant's testimony was all introduced, but before the argument was commenced to the jury, it would decide said motions." The defendant insisted that the court should decide his motions then, and before proceeding further with the case, but the court refused to decide said motions then or at any earlier period than it had before indicated; and defendant "duly excepted to each of said refusals, declinings, and rulings of the court."

The defendant was then directed to proceed with the case, and he again insisted to the court that he should not be compelled to proceed with the examination of his witnesses until his several motions to exclude the declarations of deceased, &c., were decided, as he could not know what to meet as to the declarations above referred to, or whether they would be in evidence or not; the court, however, required him to proceed with the examination of his witnesses, and defendant duly excepted.

The defendant then introduced witnesses who proved the nature of the message sent by defendant to Walton, as already stated, and the fact that Walton was found, immediately after the shooting, a few steps from Joe's cabin, with a loaded "Derringer" pistol in his hand. The defendant did not question the witnesses as to the declarations made by Walton, and objected to their testifying as to them; but the court overruled defendant's objection and permitted the witness to testify as to these declarations, cautioning the jury that no evidence of declarations by deceased could be considered by the jury, except such as the court should direct them to receive in evidence. To which ruling defendant duly excepted. The testimony thus given by defendant's witnesses was substantially as follows: "When one of the witnesses, Randall Gilmer, and his mother got to the place where Walton was lying, immediately after the

shooting, Walton said, '*I am a dying man; Joe shot me for nothing.*' Witness' mother replied, 'You are hurt right bad, but I reckon you aint as badly hurt as that.' Deceased answered, '*No, I am dying.*'"

The defendant then introduced some evidence tending to show, that shortly before the shooting occurred he had made preparations to remove to an adjoining plantation, and that at the time of the killing defendant's wife was pregnant. There was evidence showing that defendant had a gun with which he was in the habit of hunting.

The defendant then offered —— Johnson as a witness in his behalf, stating to the court that the witness was his wife, and that he did not offer her as a general witness in his behalf, but offered her specially and separately to prove—

1st. The violence on her person by the deceased on Sunday before the killing on the succeeding Wednesday.

2d. To prove by her that she was the *only* living witness who saw, or knew, or could testify to the commission of violence (beating) on her person by deceased on said Sunday before the killing, and to threats made by deceased against defendant before the shooting.

3d. To prove by her that she communicated, shortly before the shooting, the violence committed on her person by deceased, and the threats made by deceased against defendant.

The court refused to permit the witness to testify for the purposes for which she was offered, and decided that she was incompetent to prove anything whatever in the case; and defendant duly excepted. The defendant then closed, and the bill of exceptions states, "upon the consideration of the authorities adduced and the argument of counsel on the separate and successive motions of defendant to exclude each and all of the dying declarations of deceased, the court decided to exclude all evidence of dying declarations, except those made by the deceased when he was lying upon the ground immediately after he was shot; and all the evidence of the witnesses Hill and Merriwether in relation to the declarations of deceased were excluded." De-

fendant duly excepted to the ruling of the court in admitting any of the dying declarations as evidence.

The minute entry, after reciting the arraignment of defendant, &c., the service upon him of a copy of the indictment and list of jurors, &c., as required by law, the defendant's plea of not guilty, &c., and the order for empanneling a jury to try the issue joined, &c., then says: "The following persons were drawn and accepted by the State and defendant for the trial of this cause, to-wit: W. M. Langham, and eleven others, (naming them) good and lawful men, duly qualified; the jury being now complete, and agreed upon by the solicitor for the State and the defendant, were duly sworn to well and truly try the issue joined between the State of Alabama and the defendant, Joe Johnson, after hearing all, the evidence in the cause and being duly charged by the court, on their oaths do say, 'We, the jury, find the defendant, Joe Johnson, guilty of murder in the first degree, and assess his punishment at death. W. H. Ogbourne, foreman.' Defendant was then remanded to jail to await his sentence."

The errors assigned, among others, are—

1st. The ruling of the court in relation to the juror Brady.

2d. The refusal of the court to send for the juror Lacy, and to stop the drawing a reasonable time for that purpose.

3d. The refusal of the court to decide one way or the other upon defendant's motions to exclude evidence of the dying declarations, at the time said motions were made.

4th. The ruling of the court compelling defendant to proceed with his defense before the court had decided one way or the other upon defendant's several motions to exclude the evidence of the dying declarations.

5th. The admission of the evidence of the dying declarations, which the court permitted to go to the jury.

6th. The refusal of the court to permit defendant's wife to testify for the purposes for which she was offered.

7th. The jury which tried the case was not sworn as required by law.

THOS. G. JONES, for appellant, in support of the assignments of error, contended as follows:

As to the refusal of the court to send for the juror Lacy—

1. That in order to sustain and preserve the great fundamental right of trial by jury, the means furnished by law for its support and enforcement must be held to be a part of the right itself. And as the original right is the inalienable heritage of every freeman, not dependent for its exercise on the discretion of any power, so, too, must be the administration of the statutes passed to secure the exercise of that right.—*Ex parte Chase*, 43 Ala.

2. That the statute regulating the selection of juries gives to the accused the *absolute* right to have an opportunity of choosing, as one of his triers, every one of the jurors drawn, until the jury is complete. This right is subject to defeat only by challenge by the State, or disqualification defined by law, or by the absence of such juror under such circumstances that the court can not compel his attendance in a reasonable time. The right can not be destroyed by the voluntary absence of the juror who prefers paying a fine to serving on the jury, nor by the discretion of the court. If this were so, the court might, in its discretion, send for absent jurors who were thought to be prejudiced against the prisoner, and refuse to send for those thought to be favorable to him. It was not the intention of the law to arm the court with such discretion.

3. That mere non-attendance of a juror can not of itself destroy this right of the accused. If the juror be within the power of the court, the accused has as much right to have the court exercise its powers to compel the attendance of such juror as he has to have any other right enforced.

4. That if the accused shows to the court that an absent juror is within its jurisdiction and reach, it becomes the duty of the court to order reasonable effort to be made to compel his attendance.

5. That the presence of each juror being an essential element of the right of trial by jury, its enforcement is not

dependent on the discretion of the court. And if the court refuse to suspend the drawing of the jury for a reasonable length of time, and refuse to send for such juror, it is an error for which the judgment should be reversed.

6. That it is never inconvenient to obey the law, and the inconvenience of the allowance of a constitutional right is no reason for denying its exercise. What is reasonable time in such a case, must depend greatly on the discretion of the lower court. If injury result from the exercise of this discretion, it is reviewable on appeal.

He further urged, in support of the third assignment of error, the following argument:

1. After a trial has commenced on an indictment, and the State has closed its evidence, the evidence thus offered by the State is, strictly speaking, the charge which the accused is called upon to answer.

2. In order to meet this charge, two legal methods of defense are open to a prisoner. If he deem the evidence insufficient, he may submit his case; or if he think it best, introduce witnesses in his defense, so as to break down the evidence against him. This latter right he can not freely exercise until he knows what that evidence is.

3. What is evidence, is the peculiar province of the court to decide, and it is necessary to the exercise of a prisoner's rights that he should be informed what portions of the testimony against him are legal evidence. After the State closes, he has the right to test this by motion to exclude such evidence as he may deem illegal.—21 Ala. 277; 27 Ala. 173.

4. To decline to decide such a motion one way or the other until after the defendant has offered all his evidence and closed his defense, is in effect to deny his right to submit his cause, and to deprive him of a free opportunity to break down particular parts of the testimony against him. Such a ruling greatly hampers a prisoner's defense, and tends to uncertainty and looseness, and destroys all certainty in criminal trials.—27 Ala. 173.

5. The effect of such a declining to rule one way or the other at the time such a motion is made to exclude such

Johnson v. The State.

evidence, being to hamper the prisoner's defense and deny him a plain right, it is error not to decide such a motion at the time it is made, whether the evidence sought to be excluded be legal or illegal; although the rule may be different in civil cases.

6. It is the great purpose of jury trials to keep the minds of jurors impartial, and unaffected by facts or evidence not legally affecting the issue tried before them. It happens of necessity that illegal evidence is sometimes offered, but it is the absolute right of a defendant in a criminal case to have its effect destroyed, as far as may be, by its exclusion as soon as the State has rested.

7. So far as legal consequences are concerned, an act may be a nullity. In physics and morals an act is never a nullity. The mind of man is so constituted that all evidence must necessarily have some effect on his reasonings and conclusions, which effect can not be entirely effaced even at the will of that mind. It being the legal right of an accused to have illegal evidence excluded as soon as the question is first properly presented, the error in refusing to decide such motion at the time it is made can not be cured by subsequently excluding the evidence. The legal rights of the accused have been violated by its remaining to influence the minds of the jury after his motion to exclude it. This court can not know that the accused has not been prejudiced by this denial of his legal rights. Practically speaking, it might as well be said that a declaration by a court that the judgment of a vigilance committee was a nullity, would restore to life a man hung under it, as to say that the direction of a judge to a jury not to regard illegal evidence (which had been on their minds for hours after it should have been excluded,) was sufficient in law to remove the poisonous effect of such evidence on the fairness of a juror's mind. The human mind is not a sponge out of which the judicial hand can squeeze, at will, that which it has once absorbed.

As to the exclusion of the wife—

The reason for the exclusion of the wife as a witness for or against the husband is said to be: "principally because

of the union of person; and therefore, if they were admitted to be witnesses for each other, they would contradict one maxim of the law, *nemo in propria causa testis esse debet*: and if against each other, another maxim, *nemo tenetur seipsum accusare*."—Blacks. Com. 443; see, also, 1 Phil. Ev. 78.

The main foundations of the rule against the admission of the wife as a witness in favor of the husband have been swept away by the policy of our law.—§ 2704 Rev. Code; *Robison v. Robison*, 44 Ala. 223.

The fact that their interests are identically the same, is now no reason at all. Exclusion on account of interest, or being party to the suit, is now the exception, not the rule. Interest, except in exceptional cases, does not disqualify.

The mere fact of testifying for the husband can not, in a true sense, be said to be "inconsistent with the relation of marriage." The marriage state is one of mutual helpfulness and care ; each is dependent on the other. It is not only the duty, but the law gives to each the right to slay in defense of the other. It is the most solemn duty of each to cherish and defend the other. Any mode whatever which does not violate law or morals is open to either to protect and defend the other. It is certainly not inconsistent with the marriage relation that the wife should warn the husband of danger, or that she should testify truthfully what she told the husband—and especially where the truth of the very facts she testifies to, have been brought out and established by the State, with the exception of the communication of those facts to the husband— and when it was the wife's most solemn duty to communicate these facts to the husband. The very facts of the case overthrow any presumption of inconsistency in the wife's proving the facts for which she was offered in this case.

How could the testimony of the wife in this case "lead to disunion, unhappiness, and possibly to perjury?" The husband is on trial for his life ; the wife has told him the truth; her telling that truth to the jury is of great weight in determining his life or death. Is it possible that human

nature could be so vile and mean a thing as to make cause
for " disunion and unhappiness " on the part of either hus-
band or wife out of the fact that the wife so testified in
such a case ? It can not be said that any confidence is
betrayed by the wife's testifying.

Now, as to the " temptation to perjury." There can not
be a case in which there could be less. The fact that the
wife did communicate the facts (to prove which we offered
her,) to the husband is one that can be almost established
by *presumption,* so certain was it, in accordance with the
dictates of love, duty, instinct, law, womanhood. To doubt
that she did, would be to doubt all experience—all that is
lofty and noble in human nature. The *existence* of the
facts which she communicated has already been proved by
the State. She is not a witness on her own terms, but
bound down in her narrative to facts already proved, and
asked to prove facts which, if she can not be allowed to
prove, it seems to me should, by a wise system of jurispru-
dence, be *presumed* to have been communicated by her to
the husband whenever the wife has had the opportunity to
communicate.—1 Phil. Ev. 604, note 10 ; 12 Whea. 69, 70.

The privilege or consent for the wife to be introduced
has been exercised by the husband in offering the wife as
a witness.

Every reason for the exclusion of the wife in this case,
even going to the stern standard of the common law, has
been broken down. The reason for the law ceasing, the
law ceases. The reason ceasing, " it has been the practice
of the courts to make it yield to the demands of justice."
*Robison v. Robison,* 44 Ala. 234.

The common law never excluded any testimony, even
from criminals, interested parties, parties to the suit, where
it was the presumption of law that as to such testimony
the person would speak the truth, and the facts about which
he testified were most likely, according to the experience
of mankind, to have occurred as testified to; and the evi-
dence itself, not the vehicle by which it is brought to notice,
is not excluded by considerations of public policy. It is a
presumption of law, that no man will deliberately make

admissions which are injurious to his interest, or his life or liberty, unless his admissions are true; for this reason, declarations of a prisoner are received as evidence against him. It is natural, and according to human experience, that a guilty person would make untrue statements in order to screen himself from punishment; the law presumes this, and hence will not allow a party to make evidence out of his own declarations in his own favor.

In this case, it was the duty of the wife to inform the husband—a duty enjoined by the law of God, dictated by love, and urged by instinct and womanhood. That she did communicate these facts, is borne out by the universal experience of mankind in every age.

But again. In this case the wife comes within another exception of the common law. Often the common law, from a notion of policy, would not allow a party to prove the existence of the main facts in a case by his own testimony, but when the truth of these facts was established by other witnesses, the presumptions of law against the truthfulness of the witness vanished, and he was permitted from necessity to prove facts essential to obtain justice.

The case of a person suing for the loss of a trunk by a common carrier is a familiar one. The shipment and loss of the trunk being proved by other parties, the law, to prevent a failure of justice, allows the owner to prove the contents.—*Herman v. Drinkwater*, 1 Greenl. 27; *Sneider v. Geiss*, 1 Yates, 34; see, also, 2 Mass. 444; 37 Ala. 639. Is there not great temptation to perjury here? Does not the temptation increase where the facts testified to are only known to the witness? Is not the danger of detection less? Yet, here justice, which is smothered down by precedent, cries out, and is granted relief on the plea of "necessity."

Could the necessity be greater than in this case?

Necessity is a law of our being; it results to the creature from the nature of earthly things. The creature can not, except in a very limited sense, control or foreordain events. He is imperfect, and all human regulations must for the same reason be imperfect. Wrongs arise for which there

is no remedy; rules are laid down which do wrong and injury; and hence the *exceptions* to the rules.—See 1 Phil. Ev. 78.

The books abound with exceptions from necessity.— 44 Ala. 234; 2 Mass. 444; 1 Greenl. 27; 18 Maine, 372; 21 Ver. 23; 6 Ala. 685.

In *Douglass v. Montgomery & West Point Railroad Co.*, 37 Ala. 639, this court say: " For where the law can have no force but by the evidence of persons in interest, there the rules of the common law respecting evidence in general are presumed to be *laid aside;* or rather, the subordinate are *silenced* by the most transcendent and universal rule, that in all cases that evidence is good than which the nature of the subject presumes none better to be attainable."

In that case, the exception to the general rule was sustained in order to enable a traveler to recover for a lost trunk. Here it is invoked to save life.

Again. The communication of the threats and beating to the husband, before the shooting, is evidence which, if offered by any other witness, would be received without hesitation. To refuse to receive it in that event would be monstrous.

The mental and physical surroundings of the prisoner at the time of the shooting are as much elements of his guilt or innocence as the fact of the shooting itself. To condemn without knowing these, would indeed be to immolate justice.

There is no fixed rule or law which necessity does not overrule. It excuses taking life in self-defense; it excuses the commission of crime under compulsion; it overrules general principles of evidence in admitting dying declarations; it allows the wife to testify against the husband, and governs all the innumerable transactions of life from the cradle to the grave.

The necessity of protecting the wife is so great that it overrules all other considerations, and permits her to testify in her own behalf against the husband. In fact, it places the husband in her power. This necessity is so im-

perious that it annihilates public policy—"tendency to promote unhappiness and disunion, and to perjury!"

If, from necessity, the law permits the wife to testify against the husband for her protection, by what sound and consistent rule, in a case like this, can she be excluded from testifying that another man has beaten her, and bade her convey threats to her husband, when this is necessary for the husband's protection? If in the one case she is allowed to testify for her own protection, why may she not be permitted to testify to the communication to the husband of facts brought out by the State, and for the purposes for which we offered her in her husband's defense?

One of the most effective ways in which the wife can protect the husband is to warn him of impending danger. But how will this duty be performed hereafter, if it be held that she can not tell a jury what she told the husband, when that husband is on trial for his life for a killing growing out of, and connected with, those very facts which she communicated to him? The rules of law on the subject of communications between husband and wife are intended for the promotion of confidence between man and wife, *not to destroy it*. What wife will tell the husband whom she loves of violence done her, if the law shall say that nothing which the wife shall say to the husband shall have any effect on the mind of the husband, and shall not be considered when he shall be tried for a killing done growing out of the very facts communicated to him? If the testimony of the wife is not admissible in this case, where can it ever be admissible? According to the doctrine contended for by the State, all humanity must stand silenced, and all of God's laws be hurled aside, whenever the wife is the only witness to complain to her husband of her wrongs. The wife overpowered, when alone, may be robbed of all that woman holds dear, and if she tells the husband of her wrongs, and the husband, in his transport of rage, slays the violator of his and her honor, a blind and monstrous precedent comes in, by excluding the truth because the wife alone knows it, to immolate him on the altar of what is called justice. The rule contended for by

the State destroys all confidence on this subject between man and wife. The timid wife will submit to wrong rather than inform the husband of facts which must have effect upon his mind and actions, and control his doings, and yet which, in law, shall not even be shown. Will the law allow the deed to be shown for the husband's destruction, but none of the causes or facts for his salvation?—*Flannagan v. State*, 46 Ala. 703.

The decisions that a wife can not be a general witness in favor of the husband are not attacked. They have nothing to do with this case.

No case like this was ever found in any book. It stands on its own necessities and merits. It is not governed by any rule of law which excludes the evidence, and is within many of the exceptions which would admit it even at common law.

As to the dying declarations—

None of the dying declarations should have been admitted. There is nothing to show that they were made under a sense of *impending* dissolution. The declarations admitted were made immediately after the deceased was shot; his passions were still blazing, and hope had not fled. He was not then in a condition to reflect and realize the dread reality before him. His utterances were but passion and anguish.

He never enquired about his condition; was never told he was bound to die, or that his wound was fatal. After he was taken from the ground he never said a word or did an act showing that he thought he was bound to die. His remark, "if they don't do something for me, I will die," which was a few minutes before death, shows not only that he had "not despaired of life, but had the belief that something could be done for him." He seemed only to desire immunity from pain, and was in a stupor. The evidence shows that death took him by surprise. "All at once deceased became speechless."—See *State v. Centre*, 35 Ver. 385; 8 Ohio State R. 131; 9 Humph. 23; 17 Ill. 17–22.

3

As to the oath of the jury—

Various decisions in the different courts throughout the Union, and some of our own supreme courts prior to the Code of 1852, show that where the record states that the jury were "duly sworn," or duly "sworn and charged," the appellate court will presume that the proper oath was administered, in the absence of proof to the contrary.

Presumptions have nothing to do with this case. The record itself sets out the oath taken by the jury; and that is not the oath required by law. It omits the words, "and true verdict render according to the evidence," &c.—See Rev. Code, § 4092.

This is the only oath prescribed by law. No power is given the courts to alter, change, modify, or dispense with the oath, or any part of it. When this is the case, the very form is of the essence of the law.—*Dover v. S' te*, 45 Ala. If part of the oath may be dispensed with, why not all?

Oaths have ever been regarded by the law as of great weight; nothing but the belief that the creature is about to appear before the creator can dispense with it. It is the greatest hold which the law can obtain or the conscience. It is just as essential that the jury should take the oath required by law, as that it should consist of twelve men. The very word "juror" imports one who is sworn. "Trial by jury," as the words are used in the constitution, had a fixed and well defined meaning at common law. One of the essentials to the constitution of a jury at common law was that it should consist of twelve sworn peers. The legislature itself can not dispense with the requirement of an oath; to do this, would be to set up a different tribunal from what the constitution intended, and the right of trial by jury would not "remain inviolable." If the law-making power can not dispense with an oath, how can the courts do it by upholding verdicts rendered by men not sworn according to law?

It is well settled that jurors must take the oath required by law.— *Williams v. State*, 45 Ala. 57, (opinion); 2 Iowa,

285; 4 *ib.* 381; *Bivens v. State,* 6 English, (Arkansas) 455; *Perry v. State,* 43 Ala. 24.

The form of oath required by law must have meant something when it uses the words, "true verdict render according to the evidence." Why was it incorporated in the oath? The courts are bound to construe it (if it can be reasonably done,) so as to give force to every word. It was incorporated to do away with an old doctrine of common law, that jurors were not bound by the evidence; the reason given for this doctrine being, that jurors were summoned from the vicinage, near the place where the crime was committed, and were therefore cognizant of the facts, whether proved by witnesses or not.—Forsyth's Trial by Jury. It was intended to prevent verdicts founded on the opinions of jurors, or on evidence known to jurors, but not de·'vered on the trial.

1 may be contended that this objection has been waived by not objecting below, and can not be raised for the first time in this court.

In the earlier days of Alabama, the supreme court had no power or jurisdiction to pass upon any questions whatever, ir  criminal case, except such as were expressly referred to it by the court below, and reserved as "novel and difficult," and perhaps by *certiorari,* &c. Afterwards, when bills of exception and appeals were allowed, the supreme court had no jurisdiction to pass upon anything not expressly objected to, and the objection stated and reserved in the bill itself, and of course, therefore, necessarily raised not for the first time in the supreme court.

Now the supreme court can look not only at the questions raised in the lower court, in the record, or in the bill of exceptions, but it "must render such judgment" on the proceedings, record, bill of exceptions, and all, "as the law demands," and must look at *all errors,* whether raised or not.

The reason for the rule in the earlier adjudications having ceased, the rule itself ceases; and this doctrine has latterly been held by this court.—*Frank v. State,* 40 Ala.

14; *Parmer v. State,* 41 Ala. 416; 41 Ala. 399; 43 Ala. 24; *ib.* 329.

Waiver stands on no higher ground than consent. To make a good waiver, it must appear that the party plainly knew what he was waiving, or was culpably negligent in not knowing.

This court knows the practice of the lower courts in administering oaths.—1 Phil. Ev. 623. It is often done by the clerk in such an inaudible and indistinct tone that the form can not be heard by a person a few feet off. It is often run over so rapidly that an error in the form can not be detected. Again : a prisoner on trial for his life may well be so engrossed with his witnesses, or in scanning and trying to learn something of the witnesses of the State, that both he and his attorneys should have their attention diverted from the form of oath being administered.

In *Frank v. The State, supra,* the court say : "In a criminal case, the prisoner will never be presumed to have waived any of his rights, except by proof amounting to direct proof of waiver. * * * Where some fact necessary to give the court jurisdiction of a particular case may not be shown by the record, * * * it can always be attacked by a direct proceeding on appeal, unless the party has waived such matter of fact. But in criminal cases such waiver is not to be presumed from the failure of the accused to raise the question in the court below."

In *Robertson v. State,* 43 Ala. 329, (top of page,) this court held that in a capital case, the record must show affirmatively that a copy of the indictment and list of jurors was served on the prisoner as required by law. That is a matter which is more certain to be brought to a prisoner's attention than a defect in the form of oath administered to a jury. Why hold that the record must show that the law had been complied with in the one case, if not in the other? The oath is just as essential for the protection of the rights of the accused, as service on him of copy of indictment, &c.—See, also, 41 Ala. 116; *ib.* 399.

The "fact necessary to give the court jurisdiction in the particular case" is, that the jury was sworn according to

law. This is a jurisdictional fact. The prisoner could no more waive, or consent to the omission of the proper oath, than he could to be tried by eleven jurymen. In either event it would be a tribunal unknown to law. Consent can not confer jurisdiction in such cases, and if it appear from the record that the court had no jurisdiction, the prisoner's waiver could not confer it. The record affirmatively shows that the proper oath was not taken, and hence a reversal must follow.—41 Ala. 116. The oath being set out, the court can not presume that any other was taken than the oath set out in the record. The common sense import of the words used forbids presumptions.—*Bivens v. State*, 6 English, 455.

No case can be found in the books, where a conviction was upheld, when the record affirmatively shows that the jury was not sworn according to law.—*Bivens v. State*, 6 English, 455.

JOHN W. A. SANFORD, Attorney-General, and WATTS & TROY, *contra.*—1. The mistake made by the officer in entering the initials of a juror on a list served upon the prisoner, is no ground for quashing the *venire.*—Rev. Code, § 4175; *Birdsong v. The State*, at the present term.

2. The court did not err in its refusal to send for Lacy and Wharton, whose names were on the list of the jurors served on the accused.—*Waller v. State*, 40 Ala. 325. Their places could be supplied by talesmen.—Rev. Code, §§ 4091, 4177. Nor in permitting Wharton to be brought in as a talesman after the list of jurors was exhausted.

3. The record does not set out the oath of the jury, but merely recites the fact that they were sworn, not to answer questions, but to try the issue. Unless the record shows to the contrary, the maxim, *omnia presumunler esse rite acta*, will control the action of this court. If the oath was not properly administered, the defendant should have objected; and failing to do so, will be presumed to have waived his right to object to the irregularity.—*Hall v. State*, present term. Inasmuch as he did not except to the action of the court below, if it erred in the administration of

the oath to the jury, he can not avail himself of it here. The court will consider no errors that were not indicated in the court below.—3 St. & Port. 222; *Lowry v. Commissioners Court*, 18 Ala. 482–88; *Murrah v. Rice*, 20 Ala. 398.

4. The court acted properly in excluding the wife of the accused.—*Hampton v. State*, 45 Ala.

The action of the court in regard to the admission of the evidence proving the dying declarations of the deceased, could not have injured the accused.—*Thomas v. Henderson*, 27 Ala. 523; see *Mose v. State*, 35 Ala.

PECK, C. J.—The appellant was indicted at the February term of the city court of Montgomery county, 1871, for the murder of Henry Walton, by shooting him with a gun. At the October term of the same year he was tried and convicted of murder in the first degree, and sentenced to be hung on Friday, the 8th day of March, 1872. From said sentence he has appealed to this court. The case has been elaborately argued, presenting many questions for consideration. An examination of the record, in connection with the arguments, has convinced us that the conviction and sentence must be reversed.

In disposing of the case, we shall confine our opinion to the questions in which, we think, errors are to be found, and to such other questions as will probably arise on another trial.

In capital cases, and other felonies, there are some matters that must affirmatively appear in the record, or the conviction will be erroneous, and the judgment of the court must be reversed.

In such cases, where the defendant is in actual imprisonment, it must affirmatively appear that a copy of the indictment and a list of the jurors summoned for his trial, including the regular jury, were delivered to him at least one entire day before the day appointed for his trial.—Revised Code, § 4171; *Robertson v. The State*, 43 Ala. 325. And in all felonies the record must show that the defendant was asked, before sentence, if he has anything to say, why judgment should not be pronounced upon him.—*Crim*

*v. The State*, 43 Ala. 53; 1 Bish. Crim. Pro. § 865.    And we hold it equally necessary to a legal conviction, that the record should show that the jury was sworn, and that the oath administered conforms substantially to the oath required to be administered by the Revised Code, § 4092. That oath requires the jurors to be sworn, not only well and truly to try the issue joined between the State of Alabama and the defendant, but also *a true verdict to render according to the evidence*.    The record in this case states, the jury "were duly sworn to well and truly try the issue joined between the State of Alabama and the defendant, Joe Johnson."    If it were stated that the jury were duly sworn according to law, it might, perhaps, be presumed they were sworn in the form required by the statute, but as the oath administered is stated, we can not presume that they were otherwise sworn.    The oath stated leaves out an essential and substantive part of the oath required to be administered, to-wit: "and a true verdict render according to the evidence: so help you God."    Thus, we see, not only an essential, but the most impressive part of the oath, was omitted; that part that directs the jurors to look to God for help, in the discharge of their important and solemn duty, a duty in which the life of a human being was involved.    This omission must necessarily render the verdict illegal, and insufficient to justify the fearful and terrible punishment to which the defendant is consigned by the sentence and judgment of the court.—*Harreman v. The State*, 2 Greene's Iowa Rep. 270–283; *Bivens v. The State*, 6 Eng. Rep. 455–465; *Jones v. The State*, 5 Ala. 666, 673.

2.  Were the declarations offered by the State, as the dying declarations of the deceased, admissible?

Dying declarations are only admissible where the deceased knows or thinks he is in a dying state.    Positive evidence of this knowledge is not required; it may be inferred from the conduct and condition of the deceased. Roscoe's Crim. Ev. 29.

It is a general rule, that dying declarations, though made with a full consciousness of approaching death, are only admissible where the death of the deceased is the subject

of the charge, and the circumstances of the death are the subject of the dying declarations.—Roscoe's Crim. Ev. 28. The dying declarations offered in evidence in this case fall strictly within this rule. The death of the deceased was the subject of the charge, and they were offered to prove the circumstances of the death of the deceased, and the party by whom it was occasioned.

A careful examination of the evidence satisfies us that the deceased not only believed that he was in a dying state, but that he was so in fact. He lived only about three or four hours after he was shot, said he was bound to die; and the physician who visited him directly after the shooting said he was then in a dying condition, was collapsed, had but little pulse, was sinking, and soon after became speechless; that after a little while he became able to speak so as to be understood. Another witness named Merriwether stated that about fifteen or twenty minutes before deceased died he said, to a question asked him by the physician, "Joe sent for me, and I went down. When I got close to him, he told me not to come closer; if I did, he would shoot me. I wheeled to walk away, and he shot me."

Other witnesses were examined on this subject, and proved similar declarations. These examinations were to the court, for the purpose of determining the admissibility of the dying declarations of the deceased, but in the presence and hearing of the jury, the court telling the jury the evidence was for the court, and not for the jury. The defendant's counsel objected to said evidence, and to the admissibility of the dying declarations of the deceased, and moved the court to exclude the same. This the court refused to do then, but said, when the evidence is closed, and before the arguments of the counsel to the jury commence, the motion of defendant to exclude the dying declarations of deceased would be decided. To these several rulings of the court the defendant excepted. The evidence of the State being closed, the court directed the defendant to proceed with the case. The defendant objected to proceeding further, or to enter upon the examination of his witnesses, until his motion to exclude the evidence of the dying

declarations of deceased was decided by the court, as he could not know what to meet, or whether said dying declarations would be evidence or not.   The court overruled defendant's objection, and directed him to proceed with the case, and defendant excepted.   Thereupon, the defendant proceeded and examined his witnesses.   After the defendant had closed his evidence, and after argument of counsel on the several motions of defendant as aforesaid, to exclude the dying declarations of deceased, the court excluded all evidence of the dying declarations of the deceased, except those made by deceased when he was lying on the ground, immediately after he was shot, and the evidence of the physician, and of a witness by the name of Merriwether; and to this ruling of the court the defendant excepted.

The court committed no error in deciding that the dying declarations of deceased, referred to, were admissible, but we think the court erred in requiring the defendant to proceed with his defense before deciding that question.   This is certainly a novel question.   No authority is referred to sustaining the decision of the court, and, so far as we know, none exists.   Novelties in the law are to be regarded with distrust.   No accused person should be required to make his defense until he is informed what the evidence against him is.   Common justice requires this, and common justice is common law.   Such a practice reverses all the well settled rules of criminal procedure on this subject, and must therefore be erroneous.

3. In a criminal case the wife is sometimes a competent witness against the husband, but never for him.—1 Greenl. Ev. § 343, and the two following sections; *Williams v. The State*, 44 Ala. 24; Revised Code, § 2704.

4. The court committed no error in refusing te quash the venire, because of the mistake in the christian name of one of the jurors in the list of jurors required to be delivered to the defendant by section 4171 of the Revised Code.   The remedy for such a mistake is provided for in section 4175, and the record shows the defendant had the benefit of that remedy.

5. Where jurors, whose names are in the list of jurors delivered to the defendant for his trial, if drawn, fail to answer when called, it is no error in the court to refuse to send for them, although it be shown that they live, and are in the city at the time they are called; but when a juror is in the jail, under an order or sentence of the court, in such a case, on the motion of the defendant, if the court refuses to send for him and have him brought into court, it is an error for which the judgment will be reversed.—*Boggs v. The State,* 45 Ala. 30.

For the errors named, the judgment is reversed, and the cause is remanded for another trial, and the defendant will remain in custody until discharged by due course of law.