# Lide *v.* The State.

*Indictment for Murder.*

1. *City court of Montgomery; power as to organization of juries.* Although the city court of Montgomery is an inferior court, and of statutory creation, it is, in all criminal matters, a court of general jurisdiction; and in the organization of grand and petit juries for the administration of the criminal law, it possesses like powers to those conferred by the statutes upon circuit courts.
2. *Same; organization of special grand jury.*—Section 5000 of the Code, providing for the organization of a special grand jury during the session of the court after the grand jury has been discharged, is not repealed, so far as Montgomery county

| | |
|---|---|
| 133 | 43 |
| 135 | 21 |
| 135 | 599 |
| 135 | 614 |
| 133 | 43 |
| 136 | 30 |
| 136 | 126 |
| 133 | 43 |
| 139 | 14 |
| 133 | 43 |
| 143 | 46 |
| 133 | 43 |
| 144 | 34 |

[Lide v. The State.]

is concerned, by the act of the General Assembly creating the city court of Montgomery and the local statutes enacted for the selection and drawing of juries for Montgomery county; and where, during the term of the city court, after the regular grand jury for such term has been discharged, an offense is committed in Montgomery county, the city court has authority and power, under said stautute (Code, § 5000), to organize a special grand jury for the investigation of the offense.

3. *Same; same.*—In the organization of a special grand jury by the city court of Montgomery, under the provisions of the statute providing therefor (Code, § 5000), where the order commands "the sheriff forthwith to summon eighteen persons possessing the requisite qualifications of grand jurors," it is no objection to an indictment preferred by the grand jury so organized, that the sheriff did not select the names of the persons summoned by him, in obedience to the orders of the court, from the jury list which is required to be kept in the office of the judge of probate by the special jury law for Montgomery county.

4. *Homicide; wife not competent witness for husband.*—On a trial under an indictment for murder, the wife of the defendant is incompetent as a witness for her husband.

5. *Argument of counsel; failure to examine witness; error without injury.*—In the trial of a criminal case, the failure of the defendant to introduce a witness subpœnaed and present, in support of the testimony of another witness examined in behalf of the defendant in reference to a fact wholly immaterial and irrelevant to any issue involved in the trial, is not the legitimate subject of comment by an attorney for the prosecution in his argument to the jury; but the refusal of the court to stop the State's counsel in commenting upon such failure of the defense is error without injury, and, therefore, will not, under the statute (Code, § 4333), work the reversal of the judgment of conviction.

6. *Same.*—Every fact which the testimony tends to prove and every inference counsel may think arises out of the testimony, is legitimate subject of criticism and discussion in the argument of counsel before juries.

7. *Trial and its incidents; order of court clearing court room.* A trial court has not only the power, but it is its duty, in the trial of cases, to prevent demonstrations of approval or disapproval by spectators in the court room; and it is no ground of objection that during the trial of a criminal case, the court had the court room cleared of all spectators, because

[Lide v. The State.]

of applause in the audience occasioned by the remarks of counsel during his argument to the jury.

8. *Insanity; burden of proof; reasonable doubt.*—When insanity is set up as a defense in a criminal case, the burden is upon the defendant to establish the insanity to the satisfaction of the jury by a preponderance of the evidence, and a reasonable doubt of the defendant's sanity, raised by all the evidence, does not justify an acquittal.

9. *Same; what necessary to justify acquittal.*—When insanity is set up as a defense in a criminal case, the defendant must show by a preponderance of the evidence (1) that at the time of the commission of the crime he was afflicted with a disease of the brain, rendering him idiotic or otherwise insane; (2) that being so afflicted he did not know right from wrong as applied to the particular action; (3) if knowing right from wrong, that he had by reason of duress of such mental disease, lost the power to choose between right and wrong, and to avoid doing the act; and (4) that the crime was so connected with such mental disease in the relation of cause and effect as to have been the product of it solely.

10. *Trial and its incidents; right of court to direct form of verdict.* On a trial of a criminal case, where the jury returns a verdict which is irregular in form, it is not error for the court to instruct the jury as to the proper form of the verdict and direct them to retire for the purpose of making the necessary corrections.

11. *Change of venue; opinions of affiants not sufficient.*—Where, on an application for a change of venue, the affidavits filed in support thereof contain the mere expression of the opinion of the parties making them, without stating any distinct, tangible facts upon which such opinions are based, the application is properly overruled, since the mere belief of the party applying for a change of venue, or of the witnesses he introduces, that a fair and impartial trial can not be had in the county in which the indictment is found, is insufficient; facts and circumstances rendering such a trial improbable must appear.

APPEAL from the City Court of Montgomery.

Tried before the Hon. A. D. SAYRE.

The appellant, Sam Lide, was indicted and tried for the murder of A. B. Johnson, was convicted of murder in the first degree and sentenced to the penitentiary for life.

On the 19th day of March, after the regular grand

jury organized for the February term of the Montgomery city court had been discharged, the court made an order, reciting that it having been made to appear that during the then, February term of the court, and since the regularly organized grand jury had been discharged, A. B. Johnson had been feloniously killed in Montgomery county, and an immediate investigation of the same was proper and necessary, and directing the sheriff to summon "18 persons possessing the requisite qualifications of grand jurors" to attend that term of the court for the purpose of investigating said killing. The clerk, thereupon, on that day, certified and delivered to the sheriff a copy of said order. No jury was drawn by the judge. No order was made by the judge of the city court directing the probate judge to exhibit any list of jurors filed in his office to the sheriff; and without consulting any list prepared by the jury commissioners, or otherwise, the sheriff, in obedience to order set forth above, selected from the general body of the citizens of the county eighteen persons whom he summoned to appear on March 26th. On the last named date, seventeen of these persons so summoned were organized into a grand jury, and on the same day preferred the alleged indictment against the defendant, on which he was tried and convicted, charging him with murdering said Johnson, and such jury was then on that day discharged. The defendant filed a motion to quash the indictment, assigning several grounds therefor. He also filed a plea in abatement raising the same question. The many grounds of the motion to quash, and the many averments in the plea in abatement, assert in substance only two propositions: (1.) The city court of Montgomery is without power to summon a special grand jury to investigate an offense committed during the term of the court and after the discharge of the grand jury regularly organized for the term. In other words, section 5000 of the Code has no application to the city court of Montgomery. (2.) Even if the court had the power to direct the summoning of such grand jury, it was not summoned and selected in the way required by statutes governing the summoning and selecting of grand juries

in Montgomery county. The motion to quash was over-ruled, and the defendant duly excepted. The State de-murred to the plea in abatement, and the court sustain-ed this demurrer, to which ruling the defendant duly excepted.

The defendant made an application for a change of venue, and in his petition averred the facts relating to the organization of a special grand jury, and also set out the statements made by his wife to him, showing that the deceased had criminally assaulted her, and then averred that T. J. Reynolds, the father of the wife of the defendant, and Oscar Johnson, the brother of the deceased, had colluded together with other persons in procuring a statement from his wife, to the effect that the deceased did not criminally assault her; that this statement had been printed in the daily papers publish-ed in Montgomery, which papers had a large circulation throughout the county; that other statements harmful and prejudicial to the defendant had been made in the papers, all of which had led a large number of people throughout the county to believe that the defendant was guilty of the crime of murder; and that, therefore, the defendant could not have a fair and impartial trial in the county of Montgomery. There were affidavits intro-duced by the defendant in support of this application, and counter affidavits introduced by the State. This application for a change of venue was denied.

The defendant pleaded "not guilty," and "not guilty by reason of insanity."

It was shown by the evidence without conflict that A. B. Johnson was killed by defendant; that the killing oc-curred on Friday morning in the store of the defendant; that Johnson and the defendant had met and spoken to each other some time before Johnson came into the de-fendant's store; that after this meeting, at which there were no demonstrations made on the part of either, Johnson walked to the store of the defendant, and after having entered the door and while about half way the store, the defendant picked up his shot gun, which was loaded with buck-shot, and fired up-on Johnson, killing him, and that after having fired the fatal shot, the defendant locked his store door, leaving

the body of Johnson on the floor, and in company with his father-in-law, one T. J. Reynolds, went to the city of Montgomery, where he surrendered himself.

There was evidence on the part of the State that the defendant had deliberately and premeditatedly determined upon killing said A. B. Johnson, and had prepared himself to do so; and that he had made inquiries as to what would be the result of his killing a man, and what was the best way to shoot a man that you were trying to kill.

There was evidence introduced by the defendant tending to show that on Sunday night before the killing Johnson had criminally assaulted and attempted to ravish the wife of the defendant; the defendant as a witness in his own behalf testifying, that his wife told him that while the defendant was away from home Sunday afternoon, she went to the store of the defendant, for the purpose of getting some flour, and while she was there, the said Johnson came into the store, pushed the door to, and while in there criminally assaulted her; that this disclosure and these statements were made by the defendant's wife to him on Monday, and that he did not see Johnson from that time until Friday morning, a short time before the homicide. The defendant further testified that as soon as he was told by his wife of the criminal assault upon her, he went at once to the home of his wife's father, T. J. Reynolds, and after a conference, his wife's father came back to his house with him, and his wife repeated the statements to her father.

T. J. Reynolds was introduced as a witness for the State, and among other things testified that on the Monday night before the killing, the defendant came to his house and stated that his wife had told him that Johnson had criminally assaulted her, and that he wanted the witness to go with him and talk over the matter with his wife; that in compliance with the request of the defendant, he went to his house and asked the defendant's wife if what the defendant had told him was true; that the defendant's wife answered that it was not true; but that the defendant had forced and compelled her to make that statement to him; that John-

son had never treated her otherwise than as a lady; that
when she made the statement to the defendant, she told
him at the time that it was not true. There was other evi-
dence introduced on the part of the State tending to
show that such statements were made by the defend-
ant's wife, because of threats made by the defendant
against her, and by reason of his coercion and compul-
sion.   There was some evidence introduced on the part
of the State tending to show that the defendant enter-
tained animosity against the deceased for a year or more
before the homicide.

There was evidence introduced on the part of the de-
fendant tending to show that immediately after the
killing and during the defendant's incarceration there
were  symptoms  of  insanity  on  the  part  of  the
defendant; that he was in a highly nervous con-
dition, very excited and acted strangely at times.   It
is, however, unnecessary to set out this evidence in de-
tail.

The defendant offered to introduce Mrs. M. E. Lide
as a witness in his behalf.   The State objected.   The
bill of exceptions then recites as follows: "Defendant's
counsel stated, first, that the witness so offered was com-
petent and offered as a witness under the special plea in
the case, and that, second, if not competent for all pur-
poses under the plea, then she was competent and offered
as a witness to testify in contradiction of the testimony
of witnesses for the State in reference to statements made
by her.   The court sustained the objection, and refused
to permit witness to testify for any purpose in the case,
and the defendant then and there duly and legally ex-
cepted to the acton of the court."

J. W. Killen was introduced as a witness for the de-
fendant, and among other things testified to a state-
ment made by Dr. Oscar Johnson, the brother of the de-
ceased, which tended to show a conspiracy between
Johnson and others against the defendant in working
up a case against him.   Killen testified that at the time
of making this statement one Tobe Jones was present.
It appeared that Tobe Jones was a witness for the de-
fendant, and was present at the trial and was sworn as

4 c

a witness. The solicitor in his argument to the jury said: "Tobe Jones was here as a witness for the defendant; why wasn't he introduced as a witness by the defendant to substantiate Mr. Killen's statement as to what Dr. Johnson said?"—tending to show that there was a conspiracy in the prosecution of the defendant. The defendant objected to this statement of the witness in his argument as being an improper comment. The court overruled the objection and the defendant duly excepted. The solicitor during his argument to the jury and while referring to the result if the defendant should be acquitted, stated that such acquittal would "allow another murderer to go unwhipped of justice." The defendant objected to the use of these words by the solicitor in his argument and duly excepted to the court's overruling his objection. One of the counsel for the prosecution, during his argument to the jury, and while referring to the killing and after detailing the testimony tending to show the homicide, stated: "This is an assassination. I assert that advisedly." The defendant duly objected to this remark. The court overruled the objection, and the defendant duly excepted.

The bill of exceptions contains the following recital: "During the closing argument there was applause and clapping of hands by persons assembled in the court house. Thereupon the court ordered that the court room be cleared of all persons except those connected with the trial, and with the court and attorneys, which order was promptly executed, and the doors of the court house were closed and locked. The remainder of the trial until after the jury was charged, and retired to consider of their verdict proceeded with the doors so closed, but persons were admitted from time to time during this period on application to the judge, and a gallery overlooking the court room remained open, but the gallery would not hold one-half the people who were excluded from the court room." The defendant objected to this action, and duly excepted to the court's overruling his objection.

Upon the introduction of all the evidence, the court, at the request of the State, gave to the jury the follow-

ing written charges: (1.) "The jury must be reason-
ably satisfied that the defendant was afflicted with a dis-
ease of the brain at the time of the killing of Johnson
before the defendant can be excused on the ground of
insanity." (2.) "The jury must be reasonably satisfied
by a preponderance of the evidence that the defendant
was afflicted with a disease of the brain at the time of
the killing of Johnson before the defendant can be ex-
cused on the ground of insanity."

The defendant separately excepted to the giving of
each of these charges, and also separately excepted to
the court's refusal to give each of the following charges
requested by him: (3.) "If from all the evidence in this
case, the jury have a reasonable doubt as to the sanity
of the defendant at the time of the killing of Johnson,
they should find him not guilty, under his plea of in-
sanity." (4.) "If the jury believe from the evidence
that the killing of the deceased by the defendant was
the offspring or product of mental disease, the verdict
of the jury should be 'not guilty by reason of insanity.' "
(5.) "If the jury believe from the evidence that the de-
fendant had but recently recovered from an attack of
typhoid fever, that when informed that the deceased had
attempted to rape his wife, he was greatly excited and
could not sleep; that he was highly wrought up; that he
wept in the public road and declared 'my life is ruined,
my wife is ruined'; that his nervous system was shat-
tered; that an indignity had been committed on his
wife by deceased; that he would break down and cry
whenever he mentioned the indignity to his wife; that
his family had been disgraced; that he seemed indiffer-
ent to his own fate; that he constantly bewailed the
disgrace which had come upon his family; that he spent
sleepless nights in the jail; would walk the floor at
night; would talk frequently to himself; pull his hair;
had a defective memory; was incoherent and discon-
nected in his thoughts and speech; was unusual in his
manners; was abnormal in his conduct and unnatural
in his ways—these symptoms, phases, manifestations
and evidences are for the jury to consider in determining
whether or not the defendant was insane at the time of
the killing." (6.) "If the jury believe from the evi-

dence that A. B. Johnson assaulted the wife of defendant, and that after defendant learned of such assault he killed Johnson, the first time he saw him; and that when defendant killed Johnson, though he was sane, he was laboring under a passion the reasonable result of the knowledge of such assault, then the jury may consider such fact in determining whether or not defendant, since he first learned of such assault had had sufficient time for his passion engendered by the knowledge of such assault to cool; and if the jury further find from the evidence that there had not been sufficient time for defendant's passion to cool, then they may consider whether or not the absence of such cooling time and the presence of such passion is sufficient to reduce from murder to manslaughter." (7.) "If the jury believe that the deceased attempted to rape the defendant's wife on Sunday evening, that the deceased left home and went into the country some distance from the place where the outrage was attempted and did not return until Friday morning, when the killing was done; that the defendant was not informed of the indignity offered to the defendant's wife until after the deceased had gone into the country, and that defendant had not seen deceased from the time he heard of the attempted rape until Friday morning, when the deceased returned, and that the defendant shot and killed Johnson, the deceased, shortly after seeing him for the first time after deceased's return home—then, upon this state of facts, without more, the jury must determine whether defendant had had sufficient time to cool his anger and indignation; and if the jury believe from the evidence that the sight of the deceased caused the defendant's passions to be suddenly inflamed and aroused, and that while thus suddenly aroused, in the heat of blood, on a sudden impulse, defendant shot and killed the deceased, then the jury, upon this state of facts, would be warranted in finding the defendant not guilty of murder in either the first or second degrees, even though the jury should find that the defendant is not guilty by reason of insanity."

The jury after retiring to consider their verdict, returned to the court room, and in response to a question

by the court, announced that they had agreed on their verdict. It was handed to the clerk and read by him, and was as follows: "We, the jury, find the defendant guilty of murder in the first degree, and fix the punishment life time in the penitentiary. C. E. Menefee, Foreman." The court said to the jury: "If you intend by this verdict to fix the punishment at imprisonment in the penitentiary, you had better change it so as to read that way exactly. I think it is all right, perhaps, as it is, but a little informal in shape. If that be your intention, write the verdict as follows: 'We, the jury, find the defendant guilty of murder in the first degree, and fix the punishment (this is right so far as it goes) at imprisonment in the penitentiary for life.' Just scratch out the words life time in the penitentiary." The defendant excepted to this further instruction to the jury. The jury having again retired to the jury room and returned to the court room, defendant objected to the verdict of the jury being received after they had been further instructed. The court overruled the objection and received the verdict, and the defendant duly and legally excepted thereto. The verdict so received was as follows: "We, the jury, find the defendant guilty of murder in the first degree, and fix the punishment at imprisonment in the penitentiary for life. C. E. Menefee, Foreman."

A. A. WILEY and WATTS, TROY & CAFFEY, for appellant.—A court has no inherent power to summon a grand jury, and is dependent solely upon the statutes as a source of authority therefor; and further, such statutes must be pursued in order that the jury may be legal and valid. As said by HOPKINS, C. J., in *State v. Williams*, 5 Porter, 135: "Men impanelled as grand jurors who were not selected and summoned to serve the purpose, are as destitute of authority to inquire into offenses and find indictments as if they had voluntarily appeared in court and offered their services as grand jurors. The act of the court in impanelling the grand jury did not supply the want of authority in the sheriff to summon the persons who were placed upon it. * * * Where men are without authority, no person

is bound to appear and except to the want of their authority to inquire into his conduct."—*Finley v. State*, 61 Ala. 199, 204-5, 207; *State v. Brooks*, 9 Ala. 12-13; *Cross v. State*, 63 Ala. 40; *O'Byrnes v. State*, 51 Ala. 28-9; *O'Brien v. State*, 91 Ala. 16; 9 Encyc. Law (1st ed.), 2-3; 10 Encyc. Pl., 362, note 1. The city court of Montgomery is one of the inferior courts of law and equity established by the general assembly.—*Sayre v. Winter*, 118 Ala. 1; Acts 1863, p. 121; Acts 1864, p. 165; 1886-87, p. 102; 1869-70, p. 47; 1874-75, pp. 212, 213; 1878-79, p. 418; 1880, pp. 267-68.

Montgomery county has a special law governing all its juries. The provisions governing the present juries are to be found in Acts of 1886-87, p. 190; 1888-89, p. 139; 1890, p. 204; 1892-93, p. 917; 1894-95, p. 34.

By the act of February 21, 1887, "to more effectually secure competent and well qualified jurors in the county of Montgomery," "a complete system is provided for the securing of competent and well qualified grand jurors as well as petit jurors for the trial of all causes by the circuit and city courts to be held in Montgomery county."—*Thomas v. State*, 124 Ala. 48; Acts of 1894-95, pp. 34, 35; Acts 1892-93, p. 917; Acts of 1888-89, p. 140; Acts 1886-87, p. 194. The act includes grand juries, and however inadvertently the legislature may have employed language, the actual words used must be given effect. "It is far better that we should abide by the words of a statute than seek to reform it according to the supposed intention."—*Coe v. Lawrence*, 1 E. & B. 516; *Maxwell v. State*, 89 Ala. 161.

Because of the express provision of section 1 of the Act of 1887 and its evident purpose, and its covering the entire field of juries, it is in conflict with section 5000 of the Code, which, it may be conceded, by section 7 of the Act of 1863, was, theretofore, a part of the jury law in Montgomery county; and, therefore, it falls, under the repealing clause of section 18. Because of this express repealing clause, the only question is whether there is a conflict.—*Thomas v. State*, 124 Ala. 48; *Oliver v. State*, 66 Ala. 9. That there is such a conflict

is evidence.—*Maxwell v. State,* 89 Ala. 160; Sutherland Statutory Construction, § 140.

The general law in the Code on this subject of juries provides qualifications for jurors and a method for ascertaining such qualifications. These qualifications, and means of ascertaining the same are different and constitute parts of entirely different systems, each of which is complete. Under the authorities *supra* the special law in this respect must govern. "Where a statute disposes of the whole subject of legislation, it is the only law. Otherwise, we shall have two systems, where one was intended to operate, and the statute becomes the law only so far as a party may choose to follow it. Besides, the mere fact that a statute is made, shows that so far as it goes, the legislature intended to displace the old rule by a new one."—*Barker v. Bell,* 46 Ala. 221. See also *Anderson's case,* 34 Tex. Cv. Rep. 96; *Elkins v. State,* 1 Tex. Ap. 539; *Shackelford v. State,* 2 Tex. Ap. 385; *Smith v. Bates,* 27 S. W. R. 1044; *Daniels v. Bridges,* 73 Tex. 149; *Wright v. Stuart,* 5 Blackf. (Ind.) 120; *State v. McNamara,* 3 Nev. 70; *State v. Taylor,* 43 La. An. 1132; *State v. Morgan,* 20 La. An. 442; *State v. DuRoche,* 20 La. An. 356; *State v. Cantrell,* 21 Ark. 127. Consequently, even if the city court had power to order a special grand jury, it was not selected and summoned as required by law; the special law made provision for the selection and for ascertaining the qualifications, and yet the sheriff ignored the special law, and only followed the general law. This was as fatal to the validity of the jury and the indictment found by it as if the court had been without authority to order it.

The wife of the defendant in this case was competent as a witness for the purpose for which she was sought to be introduced.—*Wood v. State,* 76 Ala. 39; 29 Amer. & Eng. Encyc. Law, 632; *Gafford v. State,* 125 Ala. 1; *Robison v. Robison,* 44 Ala. 233; *Robertson v. State,* 42 Ala. 513; *Clarke v. State,* 117 Ala. 7.

The defendant's failure to introduce Jones, who, according to the solicitor's statement, was in court, was no ground for an inference unfavorable to defendant, and the comment thereon was improper.—*Brock v.*

[Lide v. The State.]

*State,* 123 Ala. 24; *Coppin v. State,* 123 Ala. 58;
*Etheridge v. State,* 124 Ala. 106; *Ragland v. State,*
125 Ala. 12; *Patton v. Rambo,* 20 Ala. 485; *McAdory
v. State,* 62 Ala. 154; *Jackson v. State,* 77 Ala. 18; *Car-
ter v. Chambers,* 79 Ala. 223; *Pollak v. Harmon,* 94 Ala.
420; *Bates v. Morris,* 101 Ala. 282; *Haynes v. McRae,*
101 Ala. 319; *Stone v. State,* 105 Ala. 60, 72; *Crawford
v. State,* 112 Ala. 1, 10-11, 23; *Nelms v. Steiner,* 113 Ala.
562, 576.

CHAS. G. BROWN, Attorney-General, for the State.
The court properly overruled the motion to quash the
indictment and properly sustained the demurrer to the
plea in abatement.—*O'Byrnes v. State,* 51 Ala. 26;
*O'Brien v. State,* 91 Ala. 16; *Ezell v. State,* 102 Ala. 101;
*Germolgez v. State,* 99 Ala. 218; *Billingslea v. State,* 68
Ala. 486; *Tanner v. State,* 92 Ala. 51; Cr. Code, § 5269;
*Sampson v. State,* 107 Ala. 76; *Linnehan v. State,* 113
Ala. 70; *Kitt v. State,* 117 Ala. 213.

The court should have decided as a matter of law
that there was sufficient cooling time between the re-
ceipt of this information and the commission of the
homicide.—*Rogers v. State,* 117 Ala. 14; *Ragland v.
State,* 125 Ala. 14.

When insanity is interposed as a defense to crime, the
presumption is that he is sane, and the burden of proof
is on the defendant to prove it at least by the prepon-
derance of the evidence and a reasonable doubt does
not justify an acquittal by reason of insanity.—*Boswell
v. State,* 63 Ala. 397; *Parsons v. State,* 81 Ala. 577;
*Maxwell v. State,* 89 Ala. 150; *Martin v. State,* 119 Ala.
150. It must be the result of the duress of mental dis-
ease solely.—*Parson's case,* 81 Ala. 577.

The court did not err in its overruling the objection
of the defendant to the remark of the solicitor in his
argument to the jury.—*Mitchell v. State,* 114 Ala. 5-6;
*Cross v. State,* 68 Ala. 476; *Hobbs v. State,* 74 Ala. 41;
*Green v. State,* 97 Ala. 60; *Billingsley v. State,* 96 Ala.
126; *McNeil v. State,* 102 Ala. 127; *Cunningham v.
State,* 117 Ala. 63-65; *Osborn v. State,* 125 Ala. 106.

The presumption is in favor of the ruling of the court

below on the application for a change of venue, and further it was properly denied on its merits.—*Hawes v. State,* 88 Ala. 37; *Byers' Case,* 105 Ala. 31; *Jackson v. State,* 104 Ala. 1; *Daughdrill v. State,* 113 Ala. 7; *Hussey v. State,* 87 Ala. 125; *Thompson v. State,* 122 Ala. 12; *Rains v. State,* 88 Ala. 91; *Terry v. State,* 120 Ala. 286.

DOWDELL, J.—The city court of Montgomery, though an inferior court and of statutory creation, is, in all criminal matters, a court of general jurisdiction. Acts of 1863, p. 121. Under the act of its creation, and acts amendatory thereof, in the organization of grand and petit juries, in the administration of the criminal law, it possesses like powers to those conferred by statute on circuit courts. By the statute, (Acts, 1869-70, p. 47), there are three regular terms a year, commencing on the third Monday in February, and the second Mondays in July and October. At the February term, 1900, which was convened on the 19th day of that month, a grand jury was regularly empanneled and organized for the term, and on the 3d day of March thereafter, having completed their duties for said term, the grand jury made report to the court, and was on that day finally discharged. On the 9th day of March, and after the discharge of the regular grand jury, and during the term of said court, the homicide for which defendant was tried and convicted was committed. The commission of the homicide being made known to the court, an order was regularly made by the court on the 19th day of March, under section 5000 of the Criminal Code, for the summoning of a special grand jury, and on the 26th day of March pursuant to said order the special grand jury so ordered was duly organized and empanneled. By this grand jury the indictment in this case was found and returned into court. The indictment so found was attacked by the defendant, both by motion to quash and by plea in abatement. The trial court overruled the motion and sustained a demurrer to the plea. It is contended by the appellant that the city court was without authority or power under the law to organize a special grand jury during the term of the court, and after the regular grand jury for the term had been discharged. This contention is based upon the proposition that the

city court of Montgomery in the organization and empanneling of grand juries is limited in its authority and power by the act of its creation, and the local statutes enacted for the selection and drawing of juries for Montgomery county, and that by these statutes, in so far as the county of Montgomery is concerned, section 5000 of the Criminal Code has been repealed, and that under the local jury law for Montgomery county no authority is given for the organization of a special grand jury during the term of the court and after the regular grand jury for the term has been discharged. The local statutes referred to as regulating the selection and drawing of juries for Montgomery county are, the acts of February 21, 1887, (Acts, 1886-87, p. 190); act of December 4, 1888, amendatory of sections 3 and 9 of the act of February 21, 1887, (Acts, 1888-89, p. 139); act of December 11, 1890, (Acts, 1890-91, p. 204); act of February 21, 1893, (Acts, 1892-93, p. 917); act of December 8, 1894, (Acts, 1894-95, p. 34). It may be conceded, and which is true, that in these several enactments no provision is made for the empanneling of a special grand jury as was done in this case. It is equally clear to our mind that in these special laws, the legislature in all reference to the selection and drawing of grand juries, had in contemplation only grand juries to be regularly organized and empaneled either at the regular term, or for a special or adjourned term of the court, and not in a case of exigency, such as might arise, and which is provided for, under the provisions of section 5000 of the Criminal Code. There is nothing in any of the provisions of the several local acts above mentioned for the selection and drawing of juries for Montgomery county, which either expressly, or by necessary implication, under a reasonable and fair interpretation of these enactments, can be construed as a repeal of section 5000, as to Montgomery county. Section 18 of the act of February 21st, 1887, which contains the repealing clause of this act, after repealing section 4732 of the Code of 1876, "and all other laws and parts of laws, general and special, conflicting with the provisions of this act," further provides, "but all laws now

in force in relation to jurors, their drawing, selecting, or qualification, not in conflict with this act, are hereby continued in full force and effect." There is nothing in any of the subsequent amendatory acts above referred to, that contains any other repealing clause. Indeed, there is no more conflict between the provisions of this section of the Code and these local statutes, than there is between said section, and other sections of the Code, embraced under chapter 166, articles one, two, three, and four of that chapter, relating to the selection and drawing of juries for regular and special terms of courts. This section, 5000 of the Code, was intended to meet unusual and extraordinary conditions, with a field of operation not embraced in the provisions of either the local statutes in question, or the other sections of chapter 166 of the Code.

It clearly appears from the record that the special grand jury in this case was summoned pursuant to an order of the court made under the provisions of section 5000 of the Code, and was regularly empanneled and organized in strict conformity to the terms of that statute. We think under the principles laid down in the cases of *O'Byrnes v. State*, 51 Ala. 26, and *O'Brien v. State*, 91 Ala. 16, the city court was not without authority and power under the particular circumstances in the case to organize the special grand jury, and its rulings on the motion to quash and the plea in abatement on that ground were free from error.

The order of the court, in the language of the statute, commanded "the sheriff forthwith to summon eighteen persons possessing the requisite qualifications of grand jurors." There is nothing in the record to show that the persons summoned by the sheriff in obedience to this order, did not possess the requisite qualifications of grand jurors, and the presumption is that he discharged his duty in this respect. The fact that the sheriff did not select the names of the persons so summoned by him, from the jury list, which is required to be kept in the office of the probate judge, by the special jury law for Montgomery county, made up by the board of revenue and containing the names of the qualified jurors of said county, did not show that the names of the persons

summoned were not in fact on said jury list. The law did not require the sheriff to select from the list; it was sufficient if the names of the persons summoned were upon the jury list, and it does not appear that they were not. We do not, however, wish to be understood, by what is said above, as deciding that it is necessary for the qualification of a grand juror drawn under section 5000 of the Code, that his name should be on the list required to be filed in the office of the probate judge under the local jury law for Montgomery county. Moreover, under section 5269 of the Code, no objection can be taken to the indictment by plea in abatement or otherwise, on the ground that any member of the grand jury was not legally qualified.—*Ragland v. State,* 125 Ala. 14; *Kitt v. State,* 117 Ala. 213; *Linehan v. State,* 113 Ala. 70; *Tanner v. State,* 92 Ala. 5; *Sampson v. State,* 107 Ala. 76; *Billingslea v. State,* 68 Ala. 486; *Germolgez v. State,* 99 Ala. 218. Section 5269 further provides, that no objection can be taken to the formation of a special grand jury summoned by direction of the court.

The second question reserved by the appellant that is insisted on in argument of counsel, is the ruling of the court in refusing to allow the wife of the defendant to testify as a witness in his behalf. The incompetency of the wife as a witness for the husband in a criminal prosecution, or of the husband for the wife, is too well settled by the many decisions of this court, to call for discussion.—*Holley v. State,* 105 Ala. 100; *Hussey v. State,* 87 Ala. 135; *Childs v. State,* 55 Ala. 25; *Johnson v. State,* 47 Ala. 33; *Hampton v. State,* 45 Ala. 82; *Miller v. State, Ib.* 24; *Williams v. State,* 44 Ala. 28. Other cases might be cited, but these are sufficient to show that the question is no longer an open one in the courts of this State.

The next insistence in argument by counsel for appellant is an exception by the defendant to remarks of counsel for the State in argument before the jury, in commenting on the failure of the defense to examine one Tobe Jones, a witness subpoenaed for the defendant, in support of the testimony of one Killen, another wit-

ness for the defendant. It is urged in argument here, that the defendant's witness Killen testified to a statement made by Oscar Johnson, tending to show a conspiracy against the defendant in working up a case against him, and that Tobe Jones was present. If such was the purpose of the testimony of the witness Killen, and that is the insistence here, it was, on the undisputed evidence in the case, and on the defendant's testimony, who testified as a witness in his own behalf, wholly immaterial. The statement testified to by Killen, as having been made by Oscar Johnson, could have had no influence upon the jury on the question of the defendant's guilt. The testimony of Killen as to the statement made by Johnson, whether true or false, was altogether unimportant upon the question of the defendant's guilt, and could not possibly have influenced the jury in their finding on this question. The statement testified to by Killen as having been made by Dr. Oscar Johnson to Tobe Jones at Oak Grove on Monday after the homicide, which occurred on Friday preceding, was, to use the language of the witness Killen, "we are doing splendidly, I have busted, or opened, their scheme, and laid the whole thing bare." The evidence without dispute showed that Dr. Johnson, who was a brother of the deceased, had been looking after evidence preparatory for the prosecution of the defendant. What bearing or influence this statement in evidence could have had favorable to the defendant, under either the plea of not guilty or the additional plea of not guilty by reason of insanity, it is impossible to discover, in view of the defendant's own testimony, as well as the other undisputed evidence, as to the facts of the killing. This evidence proved the killing to have been done by the defendant with deliberation and premeditation. The defendant in his own testimony gives in detail the preparation, made by him for the commission of the crime. He gives his reason and motive for the killing—that he had been informed by his wife that the deceased had made a criminal assault upon her on Sunday evening preceding the Friday of the killing, that this information came to the defendant on Monday night. The evidence without conflict shows that he, during the

three days intervening between the time of his alleged information and the day of the killing, sought to ascertain the probable consequences to himself under the law, if he should kill the deceased. An excuse, which in law can afford no justification for the act, and after lapse of time sufficient for cooling, after receiving information of the assault, can afford no palliation of his crime. And this cooling time was, and is, a question of law, and that three days is sufficient, as a matter of law, cannot be denied.—*Ragland's case*, 125 Ala. 12; *Rogers' case*, 117 Ala. 9. We repeat, that in view of this undisputed evidence, on which the defendant was guilty under the law of murder in the first degree, it is impossible to conceive what influence the testimony of Killen as to the statement made by Dr. Johnson, whether true or false, supported or unsupported by other evidence, could have upon the jury in determining the question of defendant's guilt. For the same reason the evidence of Tobe Jones whether it did, or did not, support that of Killen, was wholly immaterial and of no consequence. Conceding, then, that the court was in error in not arresting, on the motion of the defendant, the State's counsel in commenting on the failure of the defense to examine the witness Jones, we are unable to see that the defendant was thereby prejudiced. Being satisfied that no injury resulted therefrom to the defendant, we feel it our duty under section 4333 of the Criminal Code, not to reverse the judgment of conviction on account of this error.—*Code*, § 4333; *Evans v. State*, 120 Ala. 269; *Gaston v. State*, 117 Ala. 162; *Fuller v. State*, 117 Ala. 36; *Terry v. State*, 118 Ala. 79; *Wright v. State*, 108 Ala. 60; *King v. State*, 100 Ala. 85.

The record contains other exceptions reserved by the defendant to the remarks made by counsel in argument to the jury, but those exceptions are not insisted on here. It is within the range of legitimate argument for counsel to discuss inferences that may be drawn from the evidence, and to state such inference.—*Cross v. State*, 68 Ala. 476. In *Hobbs v. State*, 74 Ala. 41, it was said by this court, in an opinion by Stone, J.: "Trial courts would be treading on dangerous ground,

were they to exercise a severe censorship over the line
of argument counsel may pursue. They must not al-
low them to constitute themselves unsworn witnesses,
and to state *as facts,* matters of which there is no testi-
mony. But we have gone no further. On the contrary,
we expressly said in *Cross' case,* (68 Ala.) that 'every
inference counsel may think arises out of the testi-
mony,' is a legitimate subject of criticism and dis-
cussion." What was here said was quoted approvingly
in *Mitchell v. State,* 114 Ala. 5, 6. We do not think
there is any merit in these exceptions.

We see no ground for objection in the court's action
in clearing the court-house, because of applause in the
audience of remarks of the State's counsel. This action
was beneficial rather than prejudicial to the defendant.
There was no deprivation of a public trial. What was
done, was for a proper and orderly administration of
the law. It was not only the power, but the duty of the
court, to prevent demonstrations of approval or disap-
proval by the spectators in the trials of causes, and if
need be, to this end, to exclude the offending parties from
the court-house.

There were a number of exceptions reserved to the
ruling of the court in the admission and exclusion of
evidence. None of these exceptions, however, are in-
sisted on in argument of appellant's counsel. We have,
nevertheless, considered them, but failed to see wherein
any error had been committed by the trial court result-
ing in injury to the defendant.

On the question of the defendant's insanity, the only
evidence offered related to his mental condition after
the commission of the homicide, and during the first week
or two of his confinement in jail. There was no evidence
offered to show insanity at or prior to the time of the
killing of the deceased, nor any effort to show any dis-
ease of the brain. The evidence tended to show a state
of nervousness and mental excitement, nothing more
than might naturally follow upon reflecting on the
crime he had committed, and the apprehension of the
dreaded consequences to come to him under the law.
The doctrine of moral or emotional insanity has no
place in our system of jurisprudence.—*Walker v. State,*

91 Ala. 76; *Parsons v. State*, 81 Ala. 577. It must be the result of the duress of mental disease *solely.—Parsons v. State, supra.* Under the plea of insanity the burden of proof is on the defendant; and what this burden of proof is, is shown in *Parson's case, supra,* and stated as follows: 1st. He must show by a preponderance of the evidence, that he, at the time of the commission of the crime, was, as a matter of fact, afflicted with a disease of the brain, so as to be idiotic, or otherwise insane. 2d. He must show by a preponderance of the evidence that being thus afflicted he did not know right from wrong as applied to the particular action. 3d. If being thus afflicted with a disease of the mind, but knowing right from wrong, he must then show by a preponderance of the evidence that by reason of the duress of such mental disease he had so far lost the power to choose between the right and wrong and to avoid doing the act, that his free agency was destroyed; and that at the same time the crime was so committed with such mental disease, in the relation of cause and effect, as to have been the product of it solely. See also, *Boswell v. State*, 63 Ala. 397; *Maxwell v. State,* 89 Ala. 150; *Martin v. State,* 119 Ala. 1; *Ragland v. State,* 125 Ala. 12. Under these authorities the rulings of the court on evidence and charges under the plea of insanity were free from error.

The written charges requested by the defendant were properly refused. These charges were faulty in that they were argumentative, or for giving undue prominence to portions of the evidence and ignoring other evidence in the case.

There was no error in the giving of the written charges requested by the State, nor was there any error in the court's instructing the jury as to the form of the verdict.

There was an application for a change of venue, which was denied by the court. While it is not insisted on here in argument as error, we have given it due consideration, and have no doubt of the correctness of the court's action in refusing it.—*Hawes v. State,* 88 Ala. 37; *Byers v. State,* 105 Ala. 31; *Jackson v. State,* 104

Ala. 1; *Daughdrill v. State,* 113 Ala. 7; *Thompson v. State,* 122 Ala. 12; *Terry v. State,* 120 Ala. 286.

We find no error in the record from which any injury resulted to the defendant, and the judgment and sentence of the court must be affirmed,

We have been furnished with an additional brief by counsel for appellant, after the foregoing opinion had been written, insisting on exceptions not insisted on in the original argument and brief. We have again gone over and carefully considered these exceptions and fail to see any reason for changing the opinion and the conclusion reached.

Affirmed.